E-FILED
Wednesday, 28 September, 2005 10:13:53 AM
Clerk, U.S. District Court, ILCD

# United States Court of Appeals

### For the Seventh Circuit

### Chicago, Illinois 60604

## NOTICE OF ISSUANCE OF MANDATE



FILED

SEP 2 8 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

DATE:    September 27, 2005

TO:    John M. Waters
       United States District Court
       Central District of Illinois
       Suite 218
       201 S. Vine Street
       U.S. Courthouse
       Urbana, IL   61802-3369

FROM:    Gino J. Agnello, Clerk

RE:    04-3100, 04-3232, 04-3841, 04-3877
       PFT Roberson Inc v. Volvo Truck North
       02 C 2096, Michael P. McCuskey, Chief Judge

       Herewith is the mandate of this court in this appeal, along
       with the Bill of Costs, if any.  A certified copy of the
       opinion/order of the court and judgment, if any, and any
       direction as to costs shall constitute the mandate.

       [ ] No record filed
       [X] Original record on appeal consisting of:

ENCLOSED:                                      TO BE RETURNED AT LATER DATE:
       [4]      Volumes of pleadings                    [ ]
       [4]      Volumes of loose pleadings              [ ]
       [12]     Volumes of transcripts                  [ ]
       [4]      Volumes of exhibits                     [ ]
       [ ]      Volumes of depositions                  [ ]
       [ ]      In Camera material                      [ ]
       [ ]      Other_____         [ ]

                _____
                Record being retained for use           [ ]
                in Appeal No. _____

       Copies of this notice sent to:        Counsel of record
       [ ]      United States Marshal
       [ ]      United States Probation Office

NOTE TO COUNSEL:
       If any physical and large documentary exhibits have been filed in
       the above-entitled cause, they are to be withdrawn ten days from the
       date of this notice.  Exhibits not withdrawn during this period will
       be disposed of.

       Please acknowledge receipt of these documents on the enclosed copy
       of this notice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
       Received above mandate and record, if any, from the Clerk, U.S.
       Court of Appeals for the Seventh Circuit.

Date:_____    _____
(1071-120397)                    Deputy Clerk, U.S. District Court

CERTIFIED COPY

In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 04-3100, 04-3232, 04-3841 & 04-3877

PFT ROBERSON, INC.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

VOLVO TRUCKS NORTH AMERICA, INC.,
and VOLVO TRANSPORTATION SERVICES, N.A., INC.,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 02-2096—Michael P. McCuskey, *Chief Judge.*

ARGUED MAY 2, 2005—DECIDED AUGUST 25, 2005

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* PFT Roberson operates a fleet of more than 1,200 long-haul trucks and trailers. Freightliner supplies, maintains, and repairs Roberson's vehicles under a fleet agreement. A "fleet agreement" is a comprehensive contract (or series of contracts) specifying the number of trucks, the price of each, how much maintenance costs per mile (a fee that increases as a truck

Nos. 04-3100 *et al.*

ages and becomes more subject to breakdowns), trade-in and other repurchase details when trucks reach the end of their useful lives, and provisions for winding up the arrangement (the "exit clause"). Exit may be complex, for it can entail early and large-scale replacements, repurchases, or swaps of used trucks, as well as disputes about cause and penalties.

Late in 2001 Freightliner sent Roberson a termination notice, which activated the exit clause. Litigation erupted when the parties could not agree on how it worked; meanwhile Roberson went shopping for another supplier and approached Volvo. The parties discussed a multi-year, $84 million arrangement for the purchase and maintenance of new Volvo trucks plus the trade-in or repair of used Freightliner trucks and trailers that Freightliner did not repurchase. Lengthy drafts were exchanged from November 2001 until late January 2002. Many "Master Agreements" were drafted; none was signed.

In March 2002 Roberson and Freightliner patched up their differences, settled the lawsuit, and extended their fleet agreement. Roberson then sued Volvo for breach of contract and fraud. According to Roberson, an email containing 572 words is the contract that Volvo breached, and the fraud consists in Volvo's efforts to negotiate additional or revised terms after sending the email. Volvo's email, dated December 6, 2001, and captioned "Confirmation of our conversation", recaps the negotiations' status. It identifies items that Roberson and Volvo had "come to agreement on" and others that the parties needed to "review and finalize."

Although the email states that the contract would be complete only when these other subjects had been resolved and the package approved by senior managers, the district judge held that a jury could find that the email constituted Volvo's assent to the items it mentioned even

Nos. 04-3100 *et al.*                                       3

if a full fleet agreement had not been signed. At the trial, the judge allowed Roberson's managers to testify that they *felt* they had an agreement with Volvo. (The objection, which the district judge rejected, was that only words *exchanged* between the parties could create a contract and that private thoughts are irrelevant.) The jury awarded Roberson more than $5 million in damages for breach of contract. Volvo appeals the district court's denial of its motion for judgment as a matter of law under Fed. R. Civ. P. 50 and contends that it is entitled to a new trial if we reject this position. Roberson has filed a cross-appeal in pursuit of damages on its fraud theory, which the district judge did not submit to the jury.

According to the email, the parties "have come to agreement on" the number of new Volvo trucks that Roberson will purchase, the cost per mile of servicing the new trucks and some of the Freightliner trucks, and an outline of an exit clause. They had not agreed on the price per truck, on the cost per mile for all of the older trucks, on the repurchase and trade-in terms for older trucks, or on the details of the exit clause—and recall that the devil was in these details for the arrangement between Roberson and Freightliner. Roberson had not bound itself to buy a single truck; it wants to treat the email as granting it a unilateral option. No reasonable jury could conclude that the items covered in the email were independent bargains to which Volvo had bound itself. The parties were negotiating a comprehensive arrangement, not a series of stand-alone contracts. The email was not something to which Roberson could respond "I accept" and move from the negotiation to the performance stage. Nor *did* Roberson say "I accept" or any equivalent; the parties negotiated for another two months, and when Volvo submitted its comprehensive proposal (at least 100 times longer than the email), Roberson refused to sign.

True enough, as Roberson stresses, truck purchases *can* be separated from truck maintenance, and in principle many subjects could be resolved one at a time. If people choose to negotiate and agree item by item, that is their privilege. But that is not what these negotiators were doing, and the email was not an à la carte menu from which Roberson could check off the items it wanted. The email and the other writings these parties exchanged show that the negotiations were global and that Volvo wanted a complete and formal arrangement before being bound. Such caution is to be expected in a multi-million-dollar deal that would last for many years. See *Central Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 492 (7th Cir. 2003); *Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 358 (7th Cir. 2001); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 815-16 (7th Cir. 1987). Here, each item that Roberson and Volvo "have come to agreement on" corresponds to a missing yet required document:

- *Termination clause.* The email contains some elements of exit arrangements but also states that Volvo must later "provide an exit clause" and that the parties need to "review and finalize" a master agreement "w/exit clause." In later drafts, the parties haggled over whether termination would be allowed at will or only for cause (a question on which the email was silent), and what penalties the party invoking the exit right must pay the other. These particulars were vital in light of the fight between Roberson and Freightliner about precisely such details.

- *Truck purchases.* According to the email Roberson would purchase at least 811 new Volvo trucks, yet a purchase order or simi-

lar recitation would be required to bind
Roberson to this provision (Volvo would
not allow itself to be bound without a
reciprocal commitment), and that was not
possible until the parties agreed on the
trucks' price, trade-in value, purchase and
delivery schedule, and buyer and seller's
remedies in case of breach, none of which
the email covered.

- *Maintenance cost per mile.* According to
the email, Volvo had agreed to maintain
Roberson's trucks for a specified cost per
mile, but the email added that the parties
still needed to reach a "Master CPM [cost-
per-mile] agreement" and approve specifi-
cation sheets to catalog the preexisting
damage and condition of each Roberson
truck. Drafts of a "Proposed Master CPM
agreement" addressed something that the
email did not: the cost per mile for trucks
older than three years. (Trucks become
more expensive to repair over time because
of wear and tear, and pennies per mile add
up to millions of dollars for a big fleet in
which each long-haul truck can average
150,000 miles per year.) At oral argument,
Roberson contended that cost per mile
could be calculated by plugging data such
as manufacturer and length in service into
a formula. No such formula appears in
either the email or any later communica-
tion, however, and "[h]aving neither set a
price, nor a mechanism to calculate a
price, the draft cannot constitute a con-
tract". *Feldman v. Allegheny International,
Inc.*, 850 F.2d 1217, 1223-24 (7th Cir.
1988).

6                                    Nos. 04-3100 *et al.*

- *Trade-in value.* A major source of Roberson's supposed damages was the generous (relative to Freightliner) trade-in allowance that Volvo offered for used trucks, yet the email makes the trade-in "subject to trade terms and conditions" derived not from industry practice but from a document containing "Volvo Trade Terms and conditions" that was never finalized.

Hundreds of pages eventually were needed to furnish these and other details. A telling fact about industry practice and business necessity is that the consummated fleet agreement between Roberson and Freightliner was of length and complexity similar to the final package that Volvo tendered to Roberson in January 2002—and two orders of magnitude longer than the email of December 2001.

Illinois supplies the substantive law: on this, if nothing else, the parties agree. When negotiators say that agreement is subject to a more definitive document, Illinois treats this as demonstrating intent not to be bound until that document has been prepared and signed. See, e.g., *Empro Manufacturing Co., Inc. v. Ball-Co Manufacturing, Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) (Illinois law); *Interway, Inc. v. Alagna*, 85 Ill. App. 3d 1094, 407 N.E.2d 615 (1st Dist. 1980). Illinois is averse to enforcing tentative agreements that are expressly contingent on the signing of formal or final documents. See, e.g., *Feldman*, 850 F.2d at 1222; *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 126-27, 481 N.E.2d 712, 715 (1985); *Baltimore & Ohio Southwestern Ry. v. People ex rel. Allen*, 195 Ill. 423, 428, 63 N.E. 262, 263 (1902).

And for good reason. Often the parties agree on some items (such as how many trucks the buyer wants) while

Nos. 04-3100 *et al.*                    7

others (such as the price) require more negotiation. If any sign of agreement on any issue exposed the parties to a risk that a judge would deem the first-resolved items to be stand-alone contracts, the process of negotiation would be more cumbersome (the parties would have to hedge every sentence with cautionary legalese), and these extra negotiating expenses would raise the effective price (for in a competitive market the buyer must cover all of the seller's costs). See Richard Craswell, *Passing on the Costs of Legal Rules: Efficiency and Distribution in Buyer-Seller Relationships*, 43 Stan. L. Rev. 361, 367-68 (1991).

Illinois permits parties to conserve these costs by reaching agreement in stages without taking the risk that courts will enforce a partial bargain that one side or the other would have rejected as incomplete. We have recognized that contracting parties often *approach* agreement in stages, not that each fledged stage represents a full agreement. See, e.g., *Empro*, 870 F.2d at 426. Thus parties may reach agreement on elements A, B and C, with more negotiation required on D and E. If elements D and E are essential to the mix, Illinois does not bind the parties to A, B, or C alone. Should agreement on essential elements fail, it is a failure of negotiation not performance. And whether extra elements *are* essential is for the parties themselves to say—as Volvo said they were in the very email that Roberson wanted to sift for favorable terms.

A comprehensive fleet agreement depended on resolving all issues that would affect the long-term dealings. The email lists many documents that contain "more of the required details" and are necessary "for each of us to review and finalize". The email offers a few subjects that the parties agree *about* but principally is a negotiation tool listing the subjects that the parties agree must be agreed *on* in the future. See *Ocean Atlantic Development*

8                                    Nos. 04-3100 *et al.*

*Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 997 (7th Cir. 2003) (Illinois law). Its language demonstrates that no contract has been reached.

Roberson insists that, because the email does not state that agreement is "subject to" these future negotiations and documents, the email binds Volvo on all terms it recites. This magic-words approach is not the law in Illinois; the parties need not recite a formula to demonstrate that a definitive agreement lies in the future. Words expressing contingency or dependence on a subsequent event or agreed-on element will do. See *Ocean Atlantic,* 322 F.3d at 999; *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 388-89 (7th Cir. 1999) (Illinois law); *Evergreen Investments, LLC v. FCL Graphics, Inc.*, 334 F.3d 750, 754-55 (8th Cir. 2003) (Illinois law); *El Reno Wholesale Grocery Co. v. Stocking*, 293 Ill. 494, 503-04, 127 N.E. 642, 646 (1920). See also *Skycom*, 813 F.2d at 816 (Wisconsin and New York law). Volvo and Roberson failed to agree on the details that the email listed as necessary. So clear is this that there was no need to ask a jury's view.

If Roberson had hit the reply button in the email program and said only "we accept," no contract would have been formed because the email was not a definitive offer; it called for negotiation of the many open details rather than acceptance of any contract limited to a subset of the issues. What Roberson actually did in response to the email was to show enthusiasm ("Let's roll", it wrote), utter some empty phrases ("we look forward" to "this long-term partnership"; see Brian Fugere, Chelsea Hardaway & Jon Warshawsky, *Why Business People Speak Like Idiots: A Bullfighter's Guide* (2005)), and propose a long list of changes and additions. So even if the December 6 email was an offer, Roberson rejected it—and could not "accept" it months later by filing suit for damages. Roberson never signed anything or tried to accept by performance (as by

paying for 811 tractor-trailer sets); it treats the December 6 email as an option. Yet Volvo did not give Roberson a unilateral option, least of all one that could be exercised by suit rather than by payment.

Roberson's position—that as soon as parties agree on any term, it is a jury question whether there is a contract on this term alone—would make negotiations far too risky and is not the law in Illinois or any other jurisdiction of which we are aware. The give-and-take of negotiations will leave parties with bargains on some terms that must be made up for by others that benefit the trading partner. Letting one side accept the favorable terms without the compensatory ones would be like permitting the buyer to say: "We have agreed on quantity but not price; I now accept the quantity term and am entitled to the goods at whatever price a jury thinks reasonable." Firms do not (and Volvo did not) put themselves at the mercy of their counterparts in that way. Cf. *Fidelity & Deposit Co. of Maryland v. Rotec Industries, Inc.*, 392 F.3d 944, 945 (7th Cir. 2004); *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 313 Ill. App. 3d 768, 730 N.E.2d 1143 (1st Dist. 2000). Volvo protected itself by stating in the email that many "required details" remained to be "finalize[d]"; if the details were "required," there was no agreement without them. See also E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217 (1987).

Suppose we treat the email as an expression of intent to reach agreement. The letter in *Interway* was even stronger. It stated that "this will confirm our agreement" and that "we have agreed" on certain issues, yet the Illinois judiciary held that it did not create a contract on *any* term because it showed that negotiations remained open. 85 Ill. App. 3d at 1100-01, 407 N.E.2d at 620-21. See also *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24,

10                                    Nos. 04-3100 *et al.*

578 N.E.2d 981 (1991); *Morey v. Hoffman*, 12 Ill. 2d 125, 145 N.E.2d 644 (1957). Roberson's arithmetic approach—add accords, subtract discords, the remainder equals a contract—would frustrate negotiations for all but the contemporaneous exchange of commodities (a transaction that requires few preliminaries). Parties may negotiate toward closing a deal without the risk that a jury will think that some intermediate document is a contract, and without the "fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics." *Empro*, 870 F.2d at 426; *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 432 (7th Cir. 1993); *Chicago Investment*, 107 Ill. 2d at 126-27, 481 N.E.2d at 715; *Whitelaw v. Brady*, 3 Ill. 2d 583, 590, 121 N.E.2d 785, 790 (1954).

This dispute should have been resolved in Volvo's favor on summary judgment. That conclusion makes it unnecessary to address Roberson's argument that Volvo committed "fraud" by proposing new or changed terms after December 6. See *Feldman*, 850 F.2d at 1223 (self-interested negotiation does not show bad faith or fraudulent negotiation).

REVERSED

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—8-25-05

# United States Court of Appeals

### For the Seventh Circuit

### Chicago, Illinois 60604

## JUDGMENT - WITH ORAL ARGUMENT

**Date: August 25, 2005**

**BEFORE:**          Honorable WILLIAM J. BAUER, Circuit Judge

Honorable FRANK H. EASTERBROOK, Circuit Judge

Honorable TERENCE T. EVANS, Circuit Judge

Nos. 04-3100, 04-3232, 04-3841 & 04-3877

PFT ROBERSON, INCORPORATED,
          Plaintiff - Appellee, Cross - Appellant,

   v.

VOLVO TRUCK NORTH AMERICA, INCORPORATED and VOLVO
TRANSPORTATION SERVICES NORTH AMERICA, INCORPORATED,
          Defendants - Appellants, Cross - Appellees,

Appeals from the United States District Court for the
Central District of Illinois
No. 02 C 2096, Michael P. McCuskey, Chief Judge

        The judgment of the district court is REVERSED, with costs. This
dispute should have been resolved in Volvo's favor on summary judgment.
That conclusion makes it unnecessary to address Roberson's argument that
Volvo committed "fraud" by proposing new or changed terms after
December 6. See Feldman, 850 F.2d at 1223 (self-interested negotiation
does not show bad faith or fraudulent negotiation). The above is in
accordance with the decision of this court entered on this date.

(1061-110393)